UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

MOUNTAIN STATE UNIVERSITY, INC.,

    Plaintiff,

v.                                    Civil Action No. 5:14-16682

THE HIGHER LEARNING COMMISSION,

    Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

**I.   FACTUAL BACKGROUND**

**A.** <u>**The Parties, their Functions, and their Objectives**</u>

Plaintiff Mountain State University, Inc. ("MSU"), which is incorporated in West Virginia, was a private institution of higher learning enjoying non-profit status under 26 U.S.C. § 501(c)(3).  <u>See</u> Doc. No. 1.  Plaintiff's main campus was in Beckley, West Virginia.  Plaintiff had additional campuses and/or classrooms in Martinsburg, West Virginia; Orlando, Florida; Mooresville, North Carolina; Hickory, North Carolina; Monaca, Pennsylvania; Washington, D.C.; and Charleston, West Virginia.  <u>See id</u>.

Plaintiff asserts that its "mission" from "its [very] inception" had been to "provide students, of "diverse backgrounds," with "a college education," along with skills attending "'leadership, global citizenship, and service to God and humanity.'"  <u>Id</u>.  In 1991, Plaintiff's President Charles

Polk launched an epoch of "rapid expansion" triggering various
new bachelor's and master's degrees out of MSU.  Doc. No. 90.
As such, Plaintiff "offered certificates and degrees" to
students in several disciplines, such as accounting, airline
transport professional pilot operations, aviation, business
administration, business studies, computer graphics, computer
science, diagnostic imaging, diagnostic medical sonography,
medical assisting, occupational therapy assistant, social work,
executive leadership, family nurse practitioner, nursing
administration, and criminal justice administration.  See Doc.
No. 1.  Altogether, Plaintiff offered 25 associate's degree
programs, 19 bachelor's degree programs, 8 master's degree
programs, and even a doctorate degree program in executive
leadership.  See id.  Plaintiff also commenced a nursing program
that underwent expeditious growth, evinced by its expansion into
twelve campuses statewide.  See Doc. No. 90.

Defendant The Higher Learning Commission ("HLC") is the
regional accreditation agency for degree-granting post-secondary
academic institutions across 19 states, including West Virginia.
See Doc. No. 1.  Defendant's principal place of business is
located in Chicago, Illinois.  Defendant is one of the two
commission members of the North Central Association of Colleges
and Schools ("NCA").  See id.  NCA is among the six regional

2

accreditors in this Nation that the United States Department of
Education ("DOE") recognizes for the purpose of conferring
institutional accreditation.  See id.  This is of paramount
significance to institutions since the latter's eligibility to
receive federal and state funding, including students' financial
aid pursuant to the Higher Education Act of 1965, as amended, 20
U.S.C. § 1001 et seq. ("HEA"), depends on the educational
institution's membership in an accreditor like the HLC.  In
other words, the loss of accreditation may end the institution's
very existence for all intents and purposes since, to take
Plaintiff's example, "the vast majority of its students rely
upon state and federal financial aid to finance their
education."  Id.  That is what took place in this case when
Defendant withdrew Plaintiff's accreditation.  Accreditation,
however, must be earned—and sustained—over time.

   **B. In 2008 and 2010, Defendant Accorded Notice to Plaintiff
      about Defendant's Concerns Regarding Plaintiff's
      Accreditation Status and Defendant Gave Plaintiff Several
      Opportunities to Address the Concerns**

   Educational institutions that Defendant has accredited must
demonstrate that they meet Defendant's Criteria for
Accreditation in five distinct areas: "Mission and Integrity;"
"Preparing for the Future;" "Student Learning and Effective
Teaching;" "Acquisition, Discovery and Application of

3

Knowledge;" and "Engagement of Service."  Id.  Initially, in
2008, when Defendant extended Plaintiff's accreditation,
Defendant identified various concerns with several of
"Plaintiff's programs and its overall long-term viability."
Doc. No. 90.  Defendant alerted Plaintiff, thereby putting
Plaintiff on notice, that there were somber operational and
educational concerns about Plaintiff.  Defendant observed that
Plaintiff's "'planning and budgeting processes are fragmented or
uneven;'" that it is unclear how Defendant "'will continue to
respond to future challenges and opportunities with no clearly
defined process for updating [Defendant's] long-term plans;'"
and a faculty that was so greatly burdened with its teaching
obligations that the faculty had to relent with respect to its
scholarship.  Id. (citing Doc. No. 89-5).  Accordingly,
Defendant required Plaintiff to submit a progress report and to
host a focused visit in 2010.  See id.

On July 1, 2010, the West Virginia Board of Examiners for
Registered Professional Nurses ("WVBPN") informed Defendant that
the WVBPN had mandated that Plaintiff no longer admit students
to its program due to problematic factors such as branch campus'
exam pass rate of 33%, missing student records, and want of
documentation attending the completed clinical courses.  See
Doc. No. 89-6.  Later in the month, on July 23, 2010, Defendant

was informed that yet another accreditation body, the National
League for Nursing Accreditation Commission ("NLNAC") denied
Plaintiff continued accreditation due to what NLNAC perceived as
Plaintiff's inability to comply with NLNAC's accreditation
standards.  See Doc. No. 89-7.  Moreover, initiated by an
additional accreditation agency, another investigation was also
underway.  See Doc. No. 89-8.

On August 27, 2010, Defendant informed Plaintiff, via
written notice, that the concerns highlighted by WVBPN and NLNAC
"raise[d] serious questions regarding the quality of these
academic programs."  See Doc. No. 89-9.  Defendant also sought
from the Plaintiff the information concerning those
investigations.  See id.  Plaintiff responded on September 2,
2010, that the Nursing Program was undergoing "a period of
instability" and that Plaintiff was experiencing "some
difficulty with the [nursing] program."  See Doc. No. 89-10.  On
October 26, 2010, Defendant provided written notice to Plaintiff
that due to "the seriousness of the issues and the possibility
that issues with the Nursing Program may reflect issues in other
programs that have implications for the institution's
accreditation," Plaintiff was now placed on Special Monitoring.
Doc. No. 89-12.  Defendant also advised Plaintiff of the methods
in which Plaintiff might address Defendant's concerns.

Defendant "scheduled an on-site advisory visit to investigate whether [Plaintiff] continued to [satisfy] the <u>Criteria for Accreditation</u> and advised [Plaintiff] to address during the advisory visit its compliance with Criteria 1.d, 2.b, 2.d, 3.b. and 3.c." Doc. No. 90. In this letter, Defendant explained that "the focus of this evaluation will" rest on "[Plaintiff institution's] compliance with the following <u>Criteria for Accreditation</u>:

> Criterion One, Core Component 1.d., 'the organization's governance and administrative structures promote effective leadership and support collaborative processes that enable the organization to fulfill its mission';

> Criterion Two, Core Component 2.b., 'the organization's resource base support its educational programs and its plans for maintaining and strengthening their quality in the future;'

> Criterion Three, Core Component 2.d., 'the organization's ongoing evaluation and assessment processes provide reliable evidence of institutional effectiveness that clearly informs strategies for continuous improvement;'

> Criterion [Four], Core Component 3.b., 'the organization values and supports effective teaching;' [and]

> Criterion [Five], Core Component 3.c., 'the organization creates effective learning environments.'

Doc. No. 89-12.  Furthermore, Defendant requested that Plaintiff
submit an institutional report prior to the advisory visit so
that Plaintiff might have an opportunity to address NLNAC's
action as well as an opportunity to "provide information about
[Plaintiff's] faculty governance, oversight, review of academic
and other outcomes, credentialing, and other issues of faculty
in all divisions."  Doc. No. 90.  On December 1, 2010, Plaintiff
submitted this institutional report.  See id.

        Just earlier, in November 2010, WVBPN had informed
Plaintiff that the latter's inability to satisfy state standards
had "eroded [WVBPN's] confidence in the ability of the [nursing
program's] administration to consistently adhere to [WVBPN's]
requirements."  See Doc. No. 89-14.  Consequently, WVBPN
accorded Plaintiff's Nursing Program provisional accreditation
status.  See id.  In December 2010, WVBPN informed Plaintiff
that the board concluded that more than 10% of Plaintiff's
nursing students had "problems identified," most prominently the
lack of grades.  Doc. No. 89-15.  On February 4, 2011, Defendant
informed Plaintiff that the former had learned that Plaintiff's
nursing students had filed a lawsuit against Plaintiff.  See
Doc. No. 89-16.  Along with this, Defendant counseled Plaintiff
to submit further information concerning this suit and to

arrange an open meeting with students during the impending advisory visit.  See id.

## C. HLC's Advisory Visit to MSU in February 2011

On February 14—16, 2011, an Evaluation Team of three peer reviewers made an Advisory Visit to MSU.  See Doc. No. 89-3. This team appears to have met with Plaintiff institution's students, personnel, and community members.  See id.  In addition, the team also reviewed documents and materials that Plaintiff supplied.  See id.  Upon conducting this Advisory Visit, the Evaluation team made the following observations, among others, with respect to Plaintiff's compliance with the Criteria for Accreditation 1.d, 2.b and 2.d:

> (1)  There is no increase in shared governance which has been an oft-repeated concern in previous accreditation visits. . . . The major initiatives continue to focus on growth.

> (2)  In addition, the team heard from school administrators that they had no idea there was a problem in Nursing. . . . the Institution continued to operate in a top[-]down fashion, thus impeding development of shared governance and the faculty skills and mindset for such.

> (3)  There was a pattern, as discussed by the students, of inadequate communication. Students did not know or understand their status.  They did not understand the ramifications of the current situation. . . . The team viewed such lack of proactive policies and procedures as a demonstration

of institutional failure to act with
integrity.

(4)  [Plaintiff institution's commitment to
accessibility of higher education] did not
carry through for admitted students to
Nursing in their classes being appropriately
conducted or in their ability to graduate
and successfully complete a licensing
examination.

(5)  [T]he numbers of faculty are inadequate
and [] the development of faculty in
governance responsibilities has not been
addressed.  This is [also] seen as an
institutional problem . . . in Nursing.

<u>Id</u>. (citations and internal quotation marks omitted).  Defendant

sent Plaintiff the Advisory Visit Report on May 18, 2011, and

then gave Plaintiff the opportunity to object.  <u>See</u> Doc. No. 89-

17.  A few weeks later, on June 2, 2011, Defendant gave

Plaintiff the final Advisory Visit Report.  <u>See</u> Doc. No. 89-18.

Defendant explained in the final Advisory Visit Report that the

Evaluation Team observed the existence of issues which "are, in

some cases, indicative of an institutional culture rather than a

nursing-specific problem, and that [Plaintiff institution had]

not demonstrated that it responds consistently or systematically

to identified issues."  <u>Id</u>.  Defendant's President Sylvia

Manning counseled Plaintiff that she had "determined it

appropriate for [Defendant's Board of Trustees ('Trustees') to

consider a sanction of [p]robation."  <u>Id</u>.  Manning explained

that "[p]robation is a publicly disclosed sanction that
indicates that an institution is out of compliance with one or
more of the Criteria for Accreditation." Id.  Manning advised
Plaintiff that the Trustees could, at their discretion, issue a
Show-Cause Order, or indeed pursue a different course of action.
See id.  Defendant also invited Plaintiff to submit a response
to the Report as well as a response to Manning's recommendation.
See Doc. No. 89-18.  Plaintiff availed itself of this
opportunity and filed its written response on June 14, 2011.
See Doc. No. 89-19.

### D. HLC's Second Visit to MSU in February 2012

The Trustees issued a Show-Cause Order, thereby requiring
Plaintiff institution to show why its accreditation ought not to
be revoked, and to supply evidence of its satisfying the
Criteria for Accreditation.  See Doc. No. 89-20; Doc. No. 89-21.
On February 9, 2012, Defendant provided Plaintiff institution
with written notice that Defendant had been informed by certain
third parties of their concerns with Plaintiff's curricular
programs.  See Doc. No. 89-26.  Defendant accorded Plaintiff a
chance to respond to those comments and concerns.  See id.
Plaintiff subsequently submitted its response.  See Doc. No. 89-
27.

10

During February 13-15, 2012, the five-member Show-Cause Team conducted its visit to MSU.  This team then met with fifty-three administrators of MSU and it also "reviewed dozens of documents and materials provided by [Plaintiff]."  See Doc. No. 90 (citing Doc. No. 89-4).  The team also asked Plaintiff for more information, which Plaintiff provided on February 28, 2012. See Doc. No. 89-28.  Then on April 4, 2012, Defendant sent Plaintiff the Show-Cause Report assessing MSU's conformity with the Criteria for Accreditation.  See Doc. No. 89-4.  This Report determined that Plaintiff had failed to supply evidence to demonstrate that it has behaved consistently with the Criteria for Accreditation.  See id.  Specifically, Defendant asserted that Plaintiff failed to comply with the Criteria for Accreditation in these respects:

> [Criterion 1.c:] Understanding of the mission of the University is not pervasive throughout the institution. *   *   *
>
> [Criterion 1.d: Plaintiff] has not had a history of shared governance.  [Plaintiff] has not had a history of supporting a culture of transparency.  Faculty, staff, and students have not been informed about major issues facing the University and have not been involved in making decisions. While multiple constituencies have worked to define and begin initiation of a shared governance system, . . . limited time has elapsed to see the effects or continuation of the new approaches. *   *   *

[Criterion 1.c:] There are no grade point requirements or other academic standards required for enrollment in . . . independent courses . . .. The Team did not find evidence that [the approximately 300 independent study] courses were monitored and taught in a consistent and systematic manner. *   *   *

[Criterion 2.a:] [C]ommunication among various internal sectors of the university and in multiple contexts was incomplete. . . . [T]here was no evidence provided that contingency plans in the case of future negative outcomes are in place. *   *   *

[Criterion 2.b:] [T]he team has concerns about the future financial health of [Plaintiff institution] because the institution's financial position includes accumulating substantial debt and deferred maintenance; being placed on provisional status by the Department of Education; experiencing difficulty in obtaining favorable rates on open market loans; and having an uncertain future with regard to accreditation issues, rental tenants in the mall property, and numerous pending lawsuits. *   *   *

[Criterion 2.c:] While elements of an ongoing evaluation and assessment process are in place, the Team is concerned that insufficient time has elapsed to assure their potential is realized and result in continuous improvement. *   *   *

[Criterion 2.d:] Review of the [Plaintiff institution's] Strategic Plan, 2011-2016, and its related Action Plans indicate that plans have not yet matured. *   *   *

[Criterion 3.d:] While [Plaintiff institution] attempted to reduce faculty teaching loads, revise job descriptions, and

12

>put in place a plan to hire an appropriate
>number of faculty, those plans did not have
>sufficient time for enactment and thus could
>not be confirmed.

Id. (citations and internal quotation marks omitted).  The Show-

Cause Team further determined that Plaintiff was not compliant

with nine Minimum Expectations criteria:

>1.7:- The institution defines and applies
>minimum qualifications for administrators.

>1.9:- The institution evaluates its
>governance and administrative structures and
>processes regularly.

>2.2:- The institution presents itself
>accurately and honestly to the public.

>3.8:- The rigor of programs is consistent
>wherever and however curricula are delivered
>(on the main campus, at additional
>locations, by distance delivery, as dual
>credit, etc.).

>4.5:- The institution has a sufficient
>number of faculty members to carry out the
>administrative roles of faculty, in
>particular oversight of the curriculum and
>assurance that students meet program
>requirements.

>5.1:- The institution provides student
>support services consistent with the type of
>students admitted.

>6.6:- The institution has a system of
>ongoing planning and a current operational
>plan.

>6.7:- The institution's planning processes
>are linked with its budgeting process.

13

> 6.8:- The institution maintains systems for
> collecting, analyzing, and using
> institutional information.

Id. Defendant informed Plaintiff that the latter might respond
to the Show-Cause Report and that the Trustees would consider
any responses offered by Plaintiff. See id. Plaintiff
submitted its response to Defendant's Show-Cause Team Report on
April 27, 2012. See Doc. No. 89-29. Three days later, on April
27, 2012, HLC informed MSU that it had become aware of yet more
concerns about MSU, such as MSU's provisional status with
respect to Federal Student Aid, the increasing number of
lawsuits initiated by MSU's current and erstwhile students, and
the placement of MSU's diagnostic medical sonography program on
probation with a different accreditation agency. See Doc. No.
89-30. Defendant advised Plaintiff that Plaintiff was under no
obligation to respond even though, in Defendant's view,
Plaintiff should do so, which indeed Plaintiff did do on May 4,
2012. See Doc. No. 89-30; Doc. No. 89-31.

On May 7, 2012, the Trustees held a Show-Cause Hearing.
See Doc. No. 89-32. Five Trustees presided over these
proceedings, which were also attended by several members of
MSU's administration and the Show-Cause Team's chairperson. See
id. One of Defendant's Trustees during this time, Dr. Albert
Walker, had earlier served as President of Bluefield State

14

College ("BSC").  Plaintiff's allegation notwithstanding, there appears to be no evidence that Dr. Walker participated in the decisions concerning Plaintiff.  See Doc. No. 112—13.  MSU's interim President testified that Plaintiff "could not verify that it was currently in compliance with Criteria for Accreditation, or that various 2012 changes in organization and leadership would ultimately lead to compliance, but he hoped that on some indefinite future date, the changes made would be permanent and generate verifiable evidence."  See Doc. No. 90 (citing Ex. 28).

On May 21, 2012, Plaintiff submitted a letter in order "to clarify certain points" that were raised at the Show-Cause Hearing and to give "updates regarding recent developments." Doc. No. 89-33.  Just two days after this, Defendant sent Plaintiff a copy of the Show-Cause Hearing transcript, its response to Plaintiff's objections, and the information that the Houston City Attorney had contacted Defendant concerning Plaintiff's practice of awarding academic credit to Houston police officers for prior learning.  See Doc. No. 89-34.  On May 25, 2012, Plaintiff submitted a written report addressing the Houston City Attorney's concerns.  See Doc. No. 89-35.

On July 9, 2012, Defendant notified Plaintiff that the Trustees were withdrawing Plaintiff's accreditation, effective

15

August 27, 2012.  See Doc. No. 89-36.  Defendant observed that
Plaintiff "has not met the requirements of the Show-Cause Order"
upon consideration of the Show-Cause Institutional Report, the
Show-Cause Evaluation Visit Report, Plaintiff's response to the
Visit Report, the Board Committee Hearing, and certain other
documents such as those which were provided to Plaintiff in the
aftermath of the hearing.  Id.  The Trustees determined and
explained that Plaintiff had failed to satisfy Criteria One, Two
or Three.  See id.

### E. Internal Appeals Process

On July 17, 2012, Plaintiff informed Defendant that
Plaintiff would appeal this decision.  See Doc. No. 89-37.
Three days later, on July 20, 2012, Defendant set a schedule for
the appeal and requested Plaintiff's teach-out plan.  See Doc.
No. 89-38.  On July 24, 2012, Defendant informed Plaintiff that
it had decided to grant Plaintiff an extension of accreditation
until December 31, 2012 in order for students approaching
graduation to complete the semester.  See Doc. No. 89-39.

On August 6, 2012, Plaintiff submitted an appeal of the
Trustees' decision to revoke Plaintiff's accreditation.  See
Doc. No. 89-40.  Once Defendant approved Plaintiff's teach-out
plan, Defendant submitted its memorandum supporting the
Trustees' decision.  See Doc. No. 89-41.  On October 1, 2012,

16

Plaintiff submitted its reply.  See Doc. No. 89-42.  On December 4, 2012, Defendant held a hearing before an Appeals Panel composed of five members who were not current Trustees and who had had no role in the decision to withdraw accreditation.  See Doc. No. 89-43.  MSU's administrators were accorded an opportunity to make statements and answer queries about Plaintiff's accreditation.  On December 18, 2012, Defendant informed Plaintiff that the Appeals Panel affirmed the Trustees' decision to revoke Plaintiff's accreditation.  See Doc. No. 89-45.  Thus, MSU shut down operations.  See Doc. No. 82.

Plaintiff filed this lawsuit on May 20, 2014, and amended the Complaint on June 24, 2015.  See id.  Before this court, Plaintiff maintains that Defendant unlawfully withdrew Plaintiff's accreditation.  At this point in time, two residual claims alleged by Plaintiff against Defendant remain for the court's adjudication: violation of common-law due process (Count I) and tortious interference with contract (Count III).  A third claim, gross negligence (Count II) was dismissed by the court on February 16, 2016, in its Memorandum Opinion and Order.  See id. The court held a pretrial conference at the federal courthouse in Charleston, West Virginia, on November 1, 2016, with counsel present and participating.  See Doc. No. 110.

17

## II.   APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This means that if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment for the movant is inappropriate and, therefore, unavailable.  Anderson, 477 U.S. at 250; see also Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987); Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir. 1987).

The movant bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992), cert. denied, 507 U.S. 972 (1993).  A note of caution is that this "issue of fact must" actually "be 'genuine.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (quoting Fed. Rules Civ. Proc. 56(c), (e)).  Nonmovants may not conjure up some inauthentic and/or

18

insubstantial fact in order to obstruct a grant of summary judgment when a motion otherwise should elicit that disposition. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586—87 (internal citations omitted).  As Rule 56 itself stipulates, "the [nonmovant] must come forward with 'specific facts showing that there is a genuine issue for trial.'"  <u>Id</u>. at 587 (<u>quoting</u> Fed. Rule Civ. Proc. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Id</u>. at 587 (<u>quoting</u> <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

When adjudicating a summary judgment motion, the district court must heed its duty to construe the facts alleged in the light most favorable to the party <u>opposing</u> the motion.  <u>See</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Gill v. Rollins Protective Servs. Co.</u>, 773 F.2d 592, 595 (4th Cir. 1985).  Furthermore, "[a] party who bears the burden of proof on a particular claim must factually support each element of his or her claim." <u>Weakland v. United States</u>, 2005 U.S. Dist. LEXIS 2404, *9 (D. Md. Feb. 8, 2005).  Relevantly, "a complete failure of proof concerning an essential element . . . necessarily

19

renders all other facts immaterial." Celotex Corp., 477 U.S. at 323. Therefore, with respect the issues on which the nonmovant bears the burden of proof, it remains the nonmovant's "responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial." Weakland, 2005 U.S. Dist. LEXIS at *10; see also Anderson, 477 U.S. at 256; Celotex Corp., 477 U.S. at 324.

That said, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." Detrick v. Panalpina, Inc., 108 F.3d 529, 536 (4th Cir. 1997), cert. denied, 522 U.S. 810 (1997). The United States Supreme Court has asserted that there must exist "sufficient evidence favoring the [nonmovant] for a jury to return a verdict for that party." Anderson, 477 U.S. at 249-50 (citations omitted). This indicates that "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citations omitted). Quite simply, the burden is higher for a nonmovant at the summary judgment phase than at the motion to dismiss phase.

## B. Common Law Due Process

Under Fourth Circuit precedent, "there exists a 'common law duty on the part of 'quasi-public' private professional

20

organizations or accreditation associations to employ fair
procedures when making decisions affecting their members.'"
Prof'l Massage Training Ctr. v. Accreditation Alliance of Career
Sch. & Colls., 781 F.3d 161, 169 (4th Cir. 2015) (Wilkinson, J.)
(quoting McKeesport Hosp. v. Accreditation Council for Graduate
Med. Educ., 24 F.3d 519, 534—35 (3d Cir. 1994)).  The Fourth
Circuit has construed "[t]he duty . . . to operate as a 'check
on organizations that exercise significant authority in areas of
public concern such as accreditation and professional
licensing.'"  Prof'l Massage Training Ctr., 781 F.3d at 169
(quoting Thomas M. Cooley Law Sch. v. Am. Bar Ass'n, 459 F.3d
705, 712 (6th Cir. 2006)).  The Fourth Circuit, in an opinion by
Judge Wilkinson, ably has explained the "underpinnings" of this
common-law duty—"to play it straight"—incumbent on accreditation
agencies; thus, there remains no need for this court to belabor
the raison d'être of the duty.  Prof'l Massage Training Ctr.,
781 F.3d at 170.

        However, courts have no authority to "undertake a wide-
ranging review of decisionmaking by accreditation agencies."
Id.  This too the Fourth Circuit has made crystal-clear.  The
Fourth Circuit, like its sister circuits, has "limited the
judicial inquiry, drawing on principles of administrative law
and judicial deference."  Id.  Partly because "principles of

administrative law are useful in determining the standard by which we review the [agency's] decision-making process" and partly because of "[t]he quasi-public nature of the accrediting institutions and their wide-ranging expertise in what may be highly technical and specialized fields of education," the courts must apply "a deferential standard" when questioning the accreditation decisions of agencies. <u>Id</u>. at 170—71 (internal citations and quotation marks omitted).

"The . . . standard of review" the court must apply restricts the court's analysis to "consider[ing] 'only whether the decision of an accrediting agency such as [HLC] is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence.'" <u>Id</u>. at 171 (<u>quoting</u> <u>Thomas M. Cooley Law Sch. v. Am. Bar Ass'n</u>, 459 F.3d 705, 712 (6th Cir. 2006)). While the term "[s]ubstantial evidence is more than a mere scintilla," its reach goes no further than to encompass "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938) (emphasis added). "Federal courts do not undertake to 're-weigh conflicting evidence, make credibility determinations, or substitute [their] judgment' for that of the agency." <u>Prof'l</u>

22

Massage Training Ctr., 781 F.3d at 174 (quoting Craig v. Chater,
76 F.3d 585, 589 (4th Cir. 1996)).

    "In considering whether the [agency's adverse
determination] was supported by substantial evidence," this
court must "confine [itself] to the record that was considered
by the accrediting agency at the time of the final decision."
Prof'l Massage Training Ctr., 781 F.3d at 174—75.  Moreover,
recognizing that "judicial oversight of the accreditation
process surely has its place," the Fourth Circuit has also noted
that "it is not realistic to think courts possess either the
expertise or the resources to perform the accreditation function
ab initio."  Id. at 172.  After all, "[t]he range of specialized
subjects taught at all levels of higher education is vast, and
the prospect that courts can replicate the required knowledge on
the bench is dim."  Id.  Consequently, "courts are 'not free to
conduct a de novo review or to substitute their judgment for the
professional judgment of the educators involved in the
accreditation process.'"  Prof'l Massage Training Ctr., 781 F.3d
at 171 (quoting Wilfred Acad. of Hair & Beauty Culture v. S.
Ass'n of Colls. & Schs., 957 F.2d 210, 214 (5th Cir. 1992))
(emphasis added).  The Fourth Circuit derived this concept from
the "elementary principles of administrative law," which it
understood to "call for significant, though not total, deference

to decisionmaking by accreditation agencies." Prof'l Massage Training Ctr., 781 F.3d at 169.

## C. Federal Preemption

A point about preemption is fitting.  The HEA, which serves as the basis for federal jurisdiction, thus reads:

> Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary for the purpose of this subchapter and part C of subchapter I of chapter 34 of Title 42 and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court.

20 U.S.C. § 1099b(f). Since the HEA "provides for exclusive federal jurisdiction over disputes between institutions of higher education and accrediting agencies 'involving the denial, withdrawal, or termination of accreditation,' the United States Court of Appeals for the Seventh Circuit has held that federal, not state, law should govern such disputes."  Doc. No. 82 (quoting Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schools and Colls., 44 F.3d 447, 449 (7th Cir. 1994)).  Speaking for the court in Chicago Sch. of Automatic Transmissions, Judge Easterbrook articulated:

> Accreditation serves a federal function, and . . . Congress provided for exclusive

24

> federal jurisdiction of any suit by a school
> or college protesting the denial or
> withdrawal of accreditation by 'an
> accrediting agency or association approved
> by the Secretary' of Education. 20 U.S.C. §
> 1099b(f). Congress did not specify a source
> of law for these suits, but it is hard to
> see how state law could govern when federal
> jurisdiction is exclusive. It is hard enough
> to be a ventriloquist's dummy in diversity
> suits under <u>Erie</u>; it is all but impossible
> to see how federal courts could apply state
> law to the actions of accrediting agencies
> when state courts have been silenced by the
> provision for exclusive jurisdiction. If a
> grant of federal jurisdiction sometimes
> justifies creation of federal common law, .
> . . a grant of exclusive federal
> jurisdiction necessarily implicates the
> application of federal law.

<u>Id</u>. (emphasis in original).  This court already has observed

that "a 'serious question of cognizability exists' with respect

to using state law to challenge an accreditation decision."

Doc. No. 82 (<u>quoting</u> <u>Prof'l Massage Training Ctr.</u>, 781 F.3d at

180 n.3).  This court also has noted its view that "the Seventh

Circuit's position has merit."  Doc. No. 82.  However, just like

the Fourth Circuit in <u>Prof'l Massage Training Ctr.</u>, this court

must "decline[] to decide 'the broader question as to whether

Congress intended to preempt state law causes of action through

the grant of exclusive federal jurisdiction in § 1099b(f),'"

should the court determine that "'the state law claims here are

meritless on their own accord.'"  Doc. No. 82 (quoting <u>Prof'l</u>
<u>Massage Training Ctr.</u>, 781 F.3d at 180 n.3).

### III. CIRCUIT PRECEDENT'S POSITION

"[I]nstitution[s] denied accreditation [are] likely to
promptly [go] out of business—as very few people [are] willing
[or able] to pay tuition out of their own pockets."  <u>Prof'l</u>
<u>Massage Training Ctr.</u>, 781 F.3d at 170 (internal citations and
quotation marks omitted).  Furthermore, "[t]he denial of
accreditation to an institution may also diminish the value of a
degree earned there by students in past years."  <u>Id</u>.  In sum,
"the accreditors wield enormous power over institutions—life and
death power, some might say—which argues against allowing such
agencies free rein to pursue personal agendas or go off on some
ideological toot."  <u>Id</u>.

Overall, the courts do have a role in checking these
accreditors but only around the margins.  That role must be
discharged with modesty since "generalist federal [judges]"
cannot match "the accreditation agency's expertise and
knowledge."  <u>Id</u>. at 171.  "When adjudicating [such] claims
against accreditation agencies, courts should focus primarily on
whether the accrediting body's internal rules provide[d] a fair
and impartial procedure and whether it [followed] its rules in

26

reaching its decision." Id. at 172 (internal citations and quotation marks omitted).

In cases such as this, district courts within the Fourth Circuit have been cautioned not to "expand[] the administrative record, h[o]ld a full multi-day bench trial, receiv[e] depositions and live testimony in a way that [seeks] to make" the court "itself the primary investigator and finder of fact, and [go] far beyond the focus on procedural fairness to refashion the accreditation decision on the merits." Prof'l Massage Training Ctr., 781 F.3d at 172. As such, "the district court[s]" may not behave in a manner that is "remedially aggressive . . . in [their] awarding of a large amount of damages" or "in [their] ordering that the institution in question be reaccredited." Id. For this would amount to a district court's "overturning the judgment and expertise of an agency that in this case rested on a sound and supportable basis." Id.

From the very outset, this court is mindful of its role, thus circumscribed, in resolving the dispute at hand. The court's inquiry, then, must be confined to examining the administrative record, to which the court will look in order to determine whether Defendant's decision was based on substantial

27

evidence and whether Defendant provided Plaintiff with adequate
due process.

### IV.   ANALYSIS: COMMON-LAW DUE-PROCESS CLAIM IS WITHOUT MERIT

### A. Defendant Adhered to "Fundamental Principles of Fairness":[1] Plaintiff Accorded Notice and a Meaningful Opportunity to be Heard

A court may determine "only whether the decision of an
accrediting agency such as [the HLC] is arbitrary and
unreasonable or an abuse of discretion and whether the decision
is based on substantial evidence."  Id. at 171 (internal
citations and quotation marks omitted).  An "agency [may] not
act in an arbitrary and capricious manner but rather" must
"'conform[] its actions to fundamental principles of fairness'
through both the procedural and substantive standards it
employ[s] in making the accreditation decision."  Id. at 172
(quoting Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical
Schs., 817 F.2d 1310, 1314 (8th Cir. 1987)).  "[N]otice and
opportunity for hearing appropriate to the nature of the case,"
Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313
(1950), are indispensable ingredients of due process and thus of
common-law due process claims.  The United States Supreme Court

---

[1] Prof'l Massage Training Ctr. v. Accreditation Alliance of
Career Sch. & Colls., 781 F.3d 161, 172 (4th Cir. 2015) (quoting
Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Schs.,
817 F.2d 1310, 1314 (8th Cir. 1987)).

has further "explained that the 'notice required will vary with
circumstances and conditions.'" <u>Jones v. Flowers</u>, 547 U.S. 220,
227 (2006) (<u>quoting</u> <u>Walker v. City of Hutchinson</u>, 352 U.S. 112,
115 (1956)).  All a district court may consider are, first,
whether the accreditation agency has in place "a fair and
impartial procedure" for its accreditation decisions and,
second, whether the accreditation agency" has adhered to "its
[own] rules in reaching its decision."  <u>Id</u>. at 172 (internal
citations and quotation marks omitted).

## (1)  <u>Defendant Provided Plaintiff With Sufficient Due Process</u>

The court is aware that "due process claims dovetail nicely
with administrative law concepts of substantial evidence and
arbitrary and capricious review because the prominent point of
emphasis of due process is one of procedure."  <u>Id</u>.  The
procedure that Plaintiff was accorded cannot be deemed wanting
under prevailing doctrine.

Defendant's assessment process took more than two years.
Defendant gave Plaintiff many opportunities to make its case and
to demonstrate its compliance with the <u>Criteria for
Accreditation</u>.  Defendant provided Plaintiff with copious
instances of notice of its concerns and determinations;
Plaintiff was given several opportunities to demonstrate its

29

compliance.  For an exhaustive list of procedural due process protections afforded Plaintiff, <u>see</u> Doc. Nos. 89-2; 89-41.

(i) <u>Letter Sent April 30, 2012</u>: Plaintiff alleges that Defendant raised "new matters" just days before the Show-Cause Hearing and did so without affording Plaintiff the opportunity to demonstrate the error or unfounded nature in those allegations.  <u>See</u> Doc. No. 67.  Yet Plaintiff itself has conceded that these "new matters" were known to it before the Show-Cause Hearing.  On April 30, 2012, Defendant informed Plaintiff of certain areas of concern.  These areas included Plaintiff's provisional status with Federal Student Aid, media reportage observing lawsuits brought against Plaintiff by its own students, and another accreditation agency's decision to place Plaintiff on probation.  <u>See</u> Doc. No. 89-30.  On May 4, 2012, Plaintiff responded to Defendant, stating that these concerns had been "known to [Defendant] for some time" and, consequently, were not novel issues.  Doc. No. 89-31.

Actually, Defendant advised Plaintiff that Plaintiff did not have to respond to those issues prior to the Board Committee Hearing that was scheduled to take place in May 2012.  Defendant also advised Plaintiff that Plaintiff could respond prior to the Board's final decision-making meeting that was scheduled to occur on June 28, 2012.  <u>See</u> Doc. No. 89-30.  Plaintiff

responded initially in its May 4, 2012 letter, followed seventeen days later in its letter dated May 21, 2012. See Doc. No. 89-31; Doc. No. 89-33. Importantly, Plaintiff did not seek additional time to address the alleged "new matters." That Plaintiff did respond reasonably speedily establishes that Plaintiff did not find itself to be sufficiently disadvantaged since it did receive adequate notice of the information. Plaintiff made a complete response prior to the Board's decision.

(ii) Letter Sent May 23, 2012: Plaintiff alleges that it was denied sufficient opportunity to respond to Defendant's May 23, 2012 letter. See Doc. No. 67. In this letter, Defendant informed Plaintiff that Defendant had become aware of the Houston City Attorney's concerns that Plaintiff accorded academic credit to Houston police officers for their "prior learning," viz. learning and experiences they had already accumulated. See Doc. No. 89-34. Actually, Plaintiff itself had received the same complaint from the Houston City Attorney on May 4, 2012. See Doc. No. 89-35. Hence, Plaintiff had known of the "prior learning" issue and may not pretend that it was caught unaware or blindsided. Additionally, Defendant requested Plaintiff respond by June 6, 2012—long before the Trustees' final decision-making meeting. See Doc. No. 89-34. On May 30,

2012, Plaintiff filed its complete and able response.  See Doc. No. 89-41.

The administrative record demonstrates that Plaintiff could and did respond to the Houston City Attorney's complaint prior to June 6, 2012.  Accordingly, Plaintiff's "late notice" complaints are without merit.  Plaintiff was given ample notice of and adequate time to respond to each of the salient concerns. Plaintiff received due process, viz. "fundamental principles of fairness" in all these respects.  Prof'l Massage Training Ctr., 781 F.3d at 172 (internal citations and quotation marks omitted).  Moreover, the explanation that Plaintiff provides in defense of its prior-learning program, known as "Prior Learning Assessment," is unconvincing.  Doc. No. 89-35.  Plaintiff admits that it "affords its adult learners the opportunity to demonstrate college level learning acquired over their professional lives and to have that learning validated and reflected on a college transcript."  Id.  Defendant is entitled to view this manner of learning as not laudable but as a way to avoid the timeliness aspect of learning and thus to dilute the value of the degrees Plaintiff confers.  Defendant is also entitled to believe that by association, Defendant and the institutions it has accredited or will accredit might become tainted as well.

### (2)  **Defendant's Rules Provide For "a Fair and Impartial Procedure,"[2] which Defendant Followed in Rendering its Decision Concerning Plaintiff**

Defendant assessed Plaintiff according to valid standards contained in its <u>Criteria for Accreditation</u>.  See "The Criteria for Accreditation and Core Components," Higher Learning Commission, <u>available at</u> <https://hlcommission.org/Criteria-Eligibility-and-Candidacy/criteria-and-core-components.html>. Defendant's policies and best practices, approved by the DOE, require that an institution conform to the <u>Criteria for Accreditation</u>.  See Doc. No. 89-11.  The court holds that the <u>Criteria for Accreditation</u> comply with the Fourth Circuit's test of "fair and impartial procedure."  <u>Prof'l Massage Training Ctr.</u>, 781 F.3d at 172 (internal quotations and citation marks omitted).

Plaintiff asserts that Defendant violated its own policies in the following respects: (1) treating the absence of an "example" of evidence demonstrating compliance with the Criteria as evidence that the Criteria were not satisfied, <u>see</u> Doc. No. 67; (2) penalizing Plaintiff for the Nursing Program's conditions that Plaintiff supposedly already had rectified, <u>see id.</u>; (3) requiring Plaintiff to demonstrate that Defendant's

---

[2] <u>Prof'l Massage Training Ctr.</u>, 781 F.3d at 172 (citations and internal quotation marks omitted).

concerns were unfounded, see id.; and (4) arbitrarily and
capriciously shortening the turn-around time Plaintiff was given
for responding to Defendant's concerns.  See id.  Each concern
is without merit.

(i)  First, Defendant did not rely on the want of "example"
evidence to infer that Plaintiff had not complied with the
Criteria for Accreditation.  See Doc. No. 89-36.  Instead,
Defendant looked at the extensive evidence garnered over almost
two years.  See Doc. No. 90.  This evidence shows that Plaintiff
did not meet the substantive requirements of various Criteria.
Defendant afforded Plaintiff enough opportunities to meet its
burden to demonstrate that it was adhering to the Criteria.
Among other things, that body of evidence consisted of
Plaintiff's failure to make sure that its programs retained
dependable and unswerving support and resources, such as
licensed clinical faculty, see Doc. No. 89-36; absence of a
grade point average requirement for its independent study
program, see id.; lack of a viable financial plan for the
future, see id.; and want of a respectable graduation rate (not
the 8% rate for first-time full-time freshmen that Plaintiff did
have), see id.

Plaintiff's failure to comply with "examples" of the
Criteria as well as its failure to conform to the Criteria's

34

substantive standards are clear.  Defendant considered the whole
host of evidence, which recognized several deficiencies in
Plaintiff institution.  That consideration was "based on facts
accumulated during two site visits and submissions from
[Plaintiff] itself."  See Doc. No. 90 (citing Doc. No. 89-36).
If Plaintiff had such evidence, it should have pointed it out to
the Trustees.  When it has failed to do so, Plaintiff has
positioned itself to forego those opportunities.  That does not
mean Plaintiff has been deprived of due process—notice and the
opportunity to be heard.

(ii) Second, Plaintiff inaccurately states that Defendant
withdrew its accreditation on the basis of "past" issues
attending the Nursing Program.  Defendant's Advisory Team
determined that MSU's shortcomings were "indicative of an
institutional culture rather than a nursing-specific problem."
See Doc. No. 89-18.  The Show-Cause Team agreed with this
conclusion.  It noted that the "[u]nderstanding of the mission
of the University is not pervasive throughout the institution,"
see Doc. No. 89-4, as well as that the "[c]ollaborative
processes and structures that promote effective leadership
throughout [Plaintiff's] campus are, at best, only in beginning
stages."  Id.  Such deficiencies appear to have been symptomatic
of Plaintiff's incessant "focus on growth rather than quality"—

35

sacrificing quality for quantity, as it were—throughout the institution. Id. Vitally important is the observation that Defendant did raise this point as early as 2008. Plaintiff seems not to have redressed the concern.

Similarly, the Trustees determined that Plaintiff's lack of compliance was not limited to one discipline, area or program. This "noncompliance," in fact, "spanned the entirety of [Plaintiff institution's] programs and administration." See Doc. No. 90 (citing Doc. No. 89-36 (Plaintiff "has had a culture focused on high enrollment growth," its recent conduct has evinced its desire "to focus more specifically on program quality," and the "oversight of all its programs . . . [is] incomplete")); Doc. No. 90 (citing Doc. No. 89-36 ("several University administrators lack credentials and previous employment experience consistent with their job titles and responsibilities")). One pattern emerges: while the problems concerning Plaintiff's Nursing Program may have been the catalysts for a harder and more comprehensive look at Plaintiff's curriculum, operations and governance, Defendant soon "discovered systemic problems in [Plaintiff] as a whole, most of which appeared to be the result of the institution['s] paying too much attention to expansion and growth, and not

36

enough attention to maintaining the quality of its programs and institutional structures." See Doc. No. 90.

(iii) Third, Plaintiff bore the burden of proving that it was in compliance with the Criteria for Accreditation. The Show-Cause Team observed that whereas Plaintiff was changing several aspects of its practices, having deemed them deficient, those modifications were only in their earliest stages; they did not demonstrate that Plaintiff presently satisfied accreditation standards. See Doc. No. 89-4. Defendant illustratively points out the example of Plaintiff's instituting a new shared governance plan that proposed to alter Plaintiff's administrative system. See Doc. No. 90. Plaintiff had not accomplished this until early 2012, which means that more than a year had elapsed since the first site visit at MSU. Accordingly, this lacuna had provoked the prevalent "concern that information provided to students is incomplete and/or inaccurate." See Doc. No. 89-4. Plaintiff's enrollment and revenue had also decreased because of the abolished Nursing Program. Nonetheless, Plaintiff failed to demonstrate that it had an achievable plan in place and ready to be triggered once the Nursing Program had dropped out of the picture. See id. Moreover, while MSU commenced working on shrinking faculty course loads, it had not managed to hire and appoint sufficient

numbers of faculty and instructors to match its present enrollment.  See id.  Indeed, Plaintiff's hiring plan would not be up to speed until 2015.  See id.

In sum, Plaintiff was required to demonstrate that it had assuaged Defendant's concerns by rectification.  Defendant concluded understandably and correctly that Plaintiff had failed to do so.

(iv) Fourth and finally, Defendant did not compress or provide an unreasonably reduced turn-around time for Plaintiff to ameliorate the problems that Defendant had identified with respect to Plaintiff institution.  The first time Defendant notified Plaintiff about the Nursing Program concerns was when Plaintiff scheduled the 2011 Advisory Visit.  Defendant gave Plaintiff a year to make the requisite changes and to prove their effectiveness.  See Doc. No. 89-36.  Plaintiff did nothing on this front until 2012.  See Doc. No. 89-4.  Then too Plaintiff's actions were limited.  Altogether, Plaintiff did too little and too late.  Plaintiff did little to show any measurable progress as to senior administration apart from replacing the President and just one or two board members.  The timing too is curious: these token changes appear to have happened just a few weeks prior to Defendant's Show-Cause Visit. Importantly, in May 2012 at the Board Committee Hearing,

38

Plaintiff's interim President testified that leadership alterations did not occur until 2012, despite the fact that this supposedly had been a "growing concern" beforehand.  See Doc. No. 89-32.

The burden to prove that it had complied with the Criteria for Accreditation belonged to Plaintiff institution.  Plaintiff has not borne that burden.  Plaintiff has shown, at best, that just "a few months before the Show-Cause Hearing, it had finally put the structures in place that could possibly lead to successful governance and academic quality at an undetermined future time."  See Doc. No. 90.  After the year of reprieve and grace period that Plaintiff was given to make appropriate reforms, Plaintiff failed to demonstrate, to Defendant's satisfaction, that it deserved the accreditation.  Defendant has demonstrated that its decision was reasonable.

Therefore, the court concludes that Defendant reached its decision neither arbitrarily nor capriciously.  See Prof'l Massage Training Ctr., 781 F.3d at 166.

**(3)   Defendant Based its Decision on "Substantial Evidence"[3]**

Defendant also reached its decision to revoke Plaintiff's accreditation on the basis of "substantial evidence."  Id. at

---

[3] Prof'l Massage Training Ctr., 781 F.3d at 172 (citations and internal quotation marks omitted).

166.  The Fourth Circuit in <u>Prof'l Massage Training Ctr.</u> has noted that "substantial evidence" is "anything more than a mere scintilla provided that a reasonable mind might accept [the evidence] as adequate to support a conclusion." <u>Id</u>. at 174 (internal quotations and citation marks omitted).  Furthermore, the "[f]ederal courts do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [their] judgment for that of the agency." <u>Id</u>. at 174 (<u>quoting</u> <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996)).  The Fourth Circuit has further made clear that "[i]n considering whether the denial was supported by substantial evidence, we [federal judges must] confine ourselves to the record that was considered by the accrediting agency at the time of the final decision." <u>Prof'l Massage Training Ctr.</u>, 781 F.3d at 174—75.

Plaintiff's entire "substantial evidence" argument hinges on its belief that Defendant discounted the views of its own personnel in issuing a Show-Cause Order instead of a sanction of probation and by disregarding the view of one member of the Show-Cause Team that Plaintiff "can make it." <u>See</u> Doc. No. 67; Doc. No. 89-32.  However, the administrative record demonstrates that Defendant did consider the whole range of views set forth by its members who inspected Plaintiff's situation.  That some members' views will receive greater institutional appreciation

40

and support over other members' views is inevitable (unless, of course, the members are unanimous).  The issues are addressed in turn:

First, in the letter of June 2, 2011 President Manning informed Plaintiff (on Defendant's behalf) that "it was appropriate for the [Trustees] to consider a sanction of probation."  Doc. No. 89-18.  Nevertheless, the President also mentioned that the Trustees had the discretion to and therefore might instead elect to issue a Show-Cause Order.  See id.  In fact, Manning's precise verbiage in this letter was that the Trustees, "in [their] discretion, may determine that one of these actions is appropriate, or may take a different action." Id.  The Trustees subsequently issued a Show-Cause Order.  This does not mean that any views did not receive the Trustees' consideration.  Defendant's policy states that it is the Board of Trustees, not the President, which "shall hold final responsibility for all accreditation actions."  See Doc. No. 89-11.  In any event, this letter was available to the Trustees as they made their decision concerning Plaintiff.  The Trustees subsequently exercised their fiduciary duties and discretion in making their decision.  Moreover, under Defendant's policies, the President was not empowered to recommend or issue a Show-Cause Order but was entitled to recommend a sanction of

41

probation.  See id.  Here, of course, the President recommended probation while, simultaneously, placing Plaintiff on notice that the Show-Cause procedure could be effectuated.  There was nothing arbitrary or capricious or, for that matter, unfounded about the way Defendant behaved in these respects.

Second, Plaintiff cites comments made by Dr. Judeen Schulte, who served as the Chair of the 2012 Show-Cause Team during the Board Committee Hearing, as evidence that Defendant has failed to appropriately consider the evaluating team's findings.  At the Board Committee Hearing, Dr. Schulte expressed her personal view that Plaintiff "can make it," to mean presumably that Plaintiff might in time be able to meet Defendant's standards required for accreditation.  See Doc. No. 89-32.  However, for several reasons, the court must take care not to read too much into this isolated assertion:

    (1)  Did Dr. Schulte purport or endeavor to give the formal view of the Show-Cause Team as an entity?  No.

    (2)  Did Dr. Schulte indicate Plaintiff was in compliance with the Criteria for Accreditation?  No.

    (3)  Did Dr. Schulte indicate in any way how long she believed it would take for Plaintiff to become compliant with the Criteria for Accreditation?  No.

42

    (4)   Importantly, did Dr. Schulte indicate any disagreement with the conclusions contained in the Show-Cause Report concerning Plaintiff's non-adherence to the <u>Criteria for Accreditation</u>?  <u>No</u>.

Consequently, Plaintiff vastly overstates the importance of Dr. Schulte's assertion.  Of course, the nature of the assertion was greatly circumscribed, as the court has just demonstrated. But even if Defendant had agreed with Dr. Schulte that Plaintiff might one day, in the fullness of time, be able to satisfy the standards, the fact still stands that on the date of the Board's final decision, Defendant was <u>not</u> in compliance with the <u>Criteria for Accreditation</u>.  Therefore, the Board had "substantial evidence" to revoke Plaintiff's accreditation. <u>Prof'l Massage Training Ctr.</u>, 781 F.3d at 166.

## B. <u>Plaintiff's Residual Allegations and Arguments are Without Merit</u>

Plaintiff also alleges that Defendant treated Plaintiff in a manner "inconsistent" with the way Plaintiff treated other similarly-situated entities.  <u>See</u> Doc. No. 67.  This is a disparate-treatment claim, not that dissimilar to the principle in federal civil rights statutes or in international investment treaties, which contain Most Favored Nation and National Treatment clauses.  <u>See, e.g.</u>, Title VII of the Civil Rights Act

43

of 1964, 42 U.S.C. § 2000e et seq.; Julien Chaisse, The Shifting Tectonics of International Investment Law—Structure and Dynamics of Rules and Arbitration on Foreign Investment in the Asia-Pacific Region, 47 GEO. WASH. INT'L L. REV. 563, 587—98 (2015).  As the United States Supreme Court has delineated, "[c]laims of disparate treatment may be distinguished from claims that stress 'disparate impact.'"  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  Disparate-impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  Id.  Plaintiff's alleged differential treatment is premised on the basis that Defendant just did not like Plaintiff or had something to gain from withdrawing Plaintiff's accreditation.

Plaintiff has not demonstrated that Defendant treated Plaintiff any worse (or for that matter, any differently) from the way Defendant treated other similarly-situated entities. "According to [Plaintiff], . . . [Defendant] treated [Plaintiff] disparately and/or that it discriminated against [Plaintiff]." Found. for Interior Design Educ. Research v. Savannah College of Art & Design, 244 F.3d 521, 529 (6th Cir. 2001).  However, "[b]ecause the record does not provide any credible indication

44

that [Defendant] had acted in an arbitrary or unreasonable manner in denying the [Plaintiff's] accreditation application, and because the record indicates that the [Defendant's] accreditation decision was based on substantial evidence," the court must reject this claim.  Id.  Two other courts rightly have observed that delving into the comparators and their treatment by the alleged defendant entity really reduces the court's role to conducting "'de novo review of [a defendant's] evaluative decisions.'"  Transport Careers, Inc. v. National Home Study Council, 646 F. Supp. 1474, 1485—86 (N.D. Ind. 1986) (quoting Marlboro Corp. v. Association of Independent Colleges & Schools, Inc., 556 F.2d 78, 80 n.2 (1st Cir. 1977)) (emphases added).  This is impermissible and stands contrary to the Fourth Circuit's guidance.  This court, accordingly, forswears that path.

### C. No Evidence of Bias Adduced

Plaintiff also claims that Defendant's decision-making was biased against Plaintiff since: (1) the Show-Cause Team was removed from witnessing and/or otherwise appreciating "expressions of support" directed towards Plaintiff institution, Doc. No. 67; (2) Defendant considered the factual inaccuracies that Plaintiff "fully refuted," id.; and (3) the president of a competing institution was on Defendant's board and/or

45

institutional action council.  Id.  The first of these
allegations is belied by the Show-Cause Team's Report, which
indicated that the team observed multiple signs and many people
wearing buttons advertising MSU's "Paint the Town Blue"
campaign.  Doc. No. 89-4.  The campaign was intended to advocate
visibly in support of Plaintiff institution's continued
accreditation.  See id. Second, Defendant's decision, which did
not ignore evidence favorable to Plaintiff institution, amply
was buttressed by the record.

     As for the third and ultimate outstanding bias allegation,
the question is whether the fact that Defendant's board included
Albert Walker, Ph.D., the former president of Bluefield State
College ("BSC"), allegedly MSU's competitor, renders summary
judgment improper.  Judicial precedent establishes, first and
foremost, that "[a]n administrative decisionmaker [is] entitled
to a presumption of honesty and integrity."  Prof'l Massage
Training Ctr., 781 F.3d at 178 (internal citations and quotation
marks omitted).  Nonetheless, "personal bias may disqualify an
adjudicator if [this bias] stem[s] from a source other than
knowledge . . . acquire[d] from participating in a case."  Id.
(emphasis added and internal citations and quotation marks
omitted).  Sometimes "the probability of actual bias on the part
of the [agency] is too high" for courts to "allow the

46

adjudicator to consider the case." Id. (internal citations and quotation marks omitted).  To illustrate, "the potential for bias is impermissibly high in those [cases] in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of [prior] personal abuse or criticism from the party before him." Id. (internal citations and quotation marks omitted).  Like in Prof'l Massage Training Ctr., "[n]either of those situations is present here." Id.

In order to defeat summary judgment, Plaintiff must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (internal citations omitted) (quoting Fed. Rule Civ. Proc. 56(e) (emphasis added)).  Plaintiff simply fails to establish that Dr. Walker participated in decisions affecting MSU or that he did so at a time or under conditions when he had or would have been perceived to have a conflict of interest that required his recusal from any deliberations attending MSU.  In addition, Dr. Walker resigned from BSC's presidency in August 2011 and in September 2011 became president of Harris-Stowe State University ("HSSU") in the State of Missouri.  Plaintiff does not cogently explain that HSSU is its competitor.  See Doc. No. 112. Accordingly, when in July 2012 Defendant withdrew Plaintiff's accreditation, Dr. Walker was no longer serving as president of

47

BSC, the alleged competitor to MSU.  See id.  At this summary-
judgment stage, Plaintiff has not pointed to any evidence in the
administrative record that Dr. Walker was or appeared to have a
disabling conflict of interest or that he took part in the
decision to withdraw Plaintiff's accreditation.

Even if Plaintiff could get past these factual problems
with respect to its bias allegation, it still must prove that
"the probability of actual bias on the part of the [agency]" was
"too high."  Prof'l Massage Training Ctr., 781 F.3d at 178
(internal citations and quotation marks omitted).  Plaintiff has
not demonstrated that Dr. Walker retained "a pecuniary interest
in the outcome," that "he ha[d] been the target of [prior]
personal abuse or criticism from the party before him," or that
he, in some other way, suffers from a high risk of an
impermissible bias derived "from a source other than knowledge .
. . acquire[d] from participating in a case."  Id.  Plaintiff
does insist that the alleged non-transparency in Defendant's
record-keeping practices prevents Plaintiff from adducing
conclusive or at least helpful evidence.  See Doc. No. 113.
Therefore, Plaintiff would have us "expand[]" rather
significantly "the administrative record . . .."  Id. at 172.
That is precisely what the Fourth Circuit has disapproved in

48

cases like this.  Consequently, Plaintiff's bias allegations fail.

The court concludes that summary judgment in favor of Defendant is appropriate with respect to the common-law due-process claim.

**V.   ANALYSIS: TORTIOUS-INTERFERENCE CLAIM IS WITHOUT MERIT**

This court has declared, in an earlier Order, that "[i]f [D]efendant fails to prevail on Count I, then surely [Defendant] will have shown that any interference was proper and, accordingly, the tortious interference claim will likewise fail." Doc. No. 82.  This condition has come true.  As such, so must the necessary condition.  Since the court shall grant summary judgment to Defendant with respect to the common-law due-process claim, the same should follow as to the tortious-interference claim.  Summary judgment, accordingly, is also granted to Defendant on the tortious-interference claim.

**VI.   ANALYSIS: THE PREEMPTION QUESTION NEED NOT BE DECIDED**

Since the court has rejected Plaintiff's state-law claims, there is no need for the court to address the matter of preemption.  This canon, which is on its face applicable when a statute's or policy's compatibility with the United States Constitution might be tested, also counsels courts to eschew needlessly reaching questions that have constitutional

implications.  This prudential rule is derived from the "fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450—51 (2008) (internal citations and quotation marks omitted).  Perhaps more broadly still, "[i]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." Burton v. United States, 196 U.S. 283, 295 (1905).  In fact, the "'cardinal principle of judicial restraint'" states that "'if it is not necessary to decide more, it is necessary not to decide more." Ventress v. Japan Airlines, 747 F.3d 716, 724 (9th Cir. 2014) (Bea, J., concurring in part) (quoting PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment)).

Following this precept, the court ought not to opine on the preemption question when the resolution of this case no longer involves that question.  Once Plaintiff loses on the state-law claims, summary judgment inevitably and automatically becomes appropriate for Defendant.  The preemption question remains no

longer "absolutely necessary to a decision of the case."
<u>Burton</u>, 196 U.S. at 295.  That should be the end of the inquiry.
Appropriately, then, this court leaves the HEA's preemption
analysis for another day and a different case.

### VII. CONCLUSION

For the reasons stated, Defendant's Motion for Summary
Judgment is **GRANTED**.

The Clerk is **DIRECTED** to forward a copy of this Memorandum
Opinion and Order to counsel of record.

**IT IS SO ORDERED** this 10th day of March, 2017.

ENTER:

David A. Faber
Senior United States District Judge